**DORA HOMES, INC., Plaintiff,**

v.

**Stuart W. EPPERSON, Edward G. Atsinger, and Salem Communications Corporation, Defendants.**

No. 02–CV–5154 (ILG).

United States District Court, E.D. New York.

Nov. 18, 2004.

Steven C. Russo, Sive, Paget & Riesel, P.C., New York, NY, for Plaintiff.

Henry Gluckstern, Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### I. INTRODUCTION

Plaintiff Dora Homes, Inc. ("Plaintiff" or "Dora Homes") brings this diversity action against Defendants Stuart W. Epperson ("Epperson"), Edward G. Atsinger ("Atsinger") (Epperson and Atsinger together are referred to as the "Individual Defendants"), and Salem Communications Corporation ("SCC") (collectively, the defendants are referred to as "Defendants"). This case arises out of the July 24, 1997 release of petroleum (the "Petroleum Discharge") from undeveloped Staten Island real property (the "Property") which Plaintiff purchased from Epperson and Atsinger in a transaction that closed on August 29, 1996. The New York State Department of Environmental Conservation ("NYSDEC") cleaned up the Petroleum Discharge. Thereafter, Plaintiff voluntarily entered into a settlement agreement and release with New York State pursuant to which it paid $250,000 (the "Settlement Money") to settle claims brought by the State against Plaintiff for the cost it incurred to clean up the oil spill.

In this suit, Plaintiff seeks to recover the money that it paid to the State as a result of the Petroleum Discharge and related damages. In the complaint (the "Complaint" or "Compl."), Plaintiff alleges statutory causes of action under the New York State Navigation Law (the "Navigation Law"), and a common law claim for indemnification.[1] Defendants now move for summary judgment on Plaintiff's claims, arguing that the Petroleum Discharge occurred when Plaintiff owned the Property, they never had knowledge that underground oil tanks existed on the Property, and there is no evidence that the oil leak started prior to July 24, 1997. Plaintiff opposes Defendants' motion and cross-moves for summary judgment on its Navigation Law claims, asserting, *inter alia,* that the undisputed material facts establish that Defendants' performance of an illegal demolition on the Property in December 1990 constituted an "act or omission" that caused the Petroleum Discharge, and that they are therefore liable to Plaintiff for the Settlement Money.

For the reasons set forth below, Defendants' motion for summary judgment is granted and Plaintiff's cross-motion for summary judgment is denied.

### II. FACTUAL BACKGROUND

The following genuine, material facts are undisputed. The Property is located at Rumba Place and Powell Place in Staten Island, New York and consists of approximately 13 acres of land. (*See* Affidavit of Arnold Brown sworn to on March 13, 2003 ("Brown 3/13/03 Aff.") ¶¶ 4–8). Relatively early in the twentieth century, the Property was known as the "Rutherford Estate," because it was owned by Joseph Francis Rutherford, the second president of the Watchtower Bible and Tract Society of Philadelphia, of the Jehovah's Witnesses. (*Id.*¶ 4). The Jehovah's Witnesses had conducted certain of their activities on the Property, and built a transmitter on it. (*Id.;* Gluckstern Certification dated September 10, 2003 ("Gluckstern 9/10/03 Cert.") Exh. F). In or about 1959, the Jehovah's Witnesses' sold the Property to WPOW, a radio station, whose transmission facilities were located on the Property.[2] (Brown 3/13/04 Aff. ¶ 5; Affidavit of

---

1. The Complaint also sets forth causes of action for trespass and negligence. (*Compl.*¶¶ 43–48, 52–57). The Court grants Defendants' summary judgment motion on these two claims because Plaintiff has abandoned them. *See* Pl. Mem. at 35 fn. 7 ("Plaintiff abandons its ... common law claims for negligence and trespass except as legal theories upon which plaintiff's common law claim for indemnification is based").

2. WPOW subsequently changed its call letters to WNYM. (Brown 3/13/03 Aff. ¶ 10).

John Linstra, sworn to on March 24, 2003 ("Linstra 3/24/03 Aff.") ¶ 4).

According to Arnold Brown, who was employed by WPOW (and later WNYM) as a broadcast engineer and program director and who worked and lived on the Property between 1961 and 1990, and John Linstra, who served as General Manager of WPOW (and later WNYM) and worked on the Property between the early 1960's and 1985, no one during this period knew of the following: (a) that underground oil tanks existed on the Property; (b) that there had been delivery of oil to an underground container on the Property; and (c) that "appurtenances" existed on the Property to an underground tank which would suggest to persons that an underground tank was, or had been, present at any time on the Property. (Brown Aff. ¶¶ 8, 12 sworn to on July 31, 2003 ("Brown 7/31/03 Aff."); Brown 3/13/03 Aff. ¶¶ 7–18; Linstra 3/24/03 Aff. ¶¶ 5–12). WNYM relocated its transmission facilities from the Property in 1989 to a site in New Jersey. (Brown 3/13/03 Aff. ¶ 10).

Consistent with this background, neither Mr. Brown nor Mr. Linstra informed the Individual Defendants that underground oil tanks existed on the Property when it was sold to them. (Brown 3/13/03 Aff. ¶ 18; Linstra 3/24/03 Aff. ¶ 14). In fact, both Mr. Brown and Mr. Linstra did not become aware of the existence of the underground oil tanks until they spoke with Defendants' counsel in late 2002 during the pendency of this case. (3/13/03 Brown Aff. ¶ 16; Linstra 3/24/03 Aff. ¶ 13). Similarly, until late 2002, shortly before the initiation of this lawsuit, Defendants were not aware that underground oil tanks existed on the Property—this was well after they had

sold the Property to Plaintiff. (Affidavit of Stuart Epperson sworn to on May 30, 2003) ("Epperson 5/30/03 Aff.") ¶¶ 8, 11; Affidavit of Edward Atsinger sworn to on May 30, 2003 ("Atsinger 5/30/03 Aff." ¶¶ 9, 11).

The Individual Defendants purchased the Property from WPOW pursuant to a contract dated February 8, 1985. (Defs. Rule 56.1 Statement ("Defs. 56.1 Statement") ¶ 1; Gluckstern Aff. Exh. A). Epperson and Atsinger entered into a lease of the Property with Salem Media Corporation ("SMC"),[3] a California radio broadcasting company, which operated a radio station on the Property from February 1985 until September 1989, when it terminated the lease and removed all of its equipment from the Property. (Compl. ¶ 10; Brown 3/13/03 Aff. ¶ 10).

By agreement dated November 20, 1990, the Individual Defendants contracted with Venstruct, Inc. (the "Contractor"), whose principal was Anthony M. Ventura ("Ventura"), to demolish all building structures located on the Property and to remove all debris from it. (Russo Aff. Exh. O). The Contractor agreed that the demolition and removal of structures from the Property "shall be done strictly in compliance with all applicable federal, state and local laws, ordinances, regulations, and rules currently in existence or promulgated during the term of" the agreement. (*Id.* ¶ 6). In addition, the Contractor represented that it would "obtain all necessary permits, and arrange for all necessary inspections, as may be required by applicable federal, state, and local agencies having jurisdiction over the demolition project." (*Id.* ¶ 7). Nonetheless, Plaintiff alleges that

---

**3.** There is no evidence in the record indicating that defendant Salem Communications Corporation (as opposed to Salem Media Corporation which entered into a lease for the Property between 1985 and 1989) had any

relationship to the Property during the time when the Individual Defendants owned it. As such, the Court grants summary judgment to SCC for that reason alone.

the demolition project was conducted in violation of certain New York City regulations. (Savo Aff. ¶ 4).

On May 1, 1996, Plaintiff's principals, through their corporation, Sophia Homes, Inc., entered into a contract (the "Contract") with Epperson and Atsinger to purchase the Property. (Defs. 56.1 Statement ¶ 2; Gluckstern 6/9/03 Cert. Exh. B). In relevant part, the Contract stated that Plaintiff "has inspected the buildings on the Premises and the personal property included in this sale and is thoroughly acquainted with their condition. Purchaser agrees to purchase them 'as is' and . . . shall have the right, after reasonable notice to the Seller, to inspect them before closing." (Gluckstern 6/9/03 Cert. Exh. B ¶ 21). The only due diligence which Plaintiff conducted as part of the transaction to purchase the Property consisted of a cursory review of the vacant and overgrown Property, and review of one survey which Defendants conducted in 1994 (the "1994 Survey"). (Pl. Rule 56.1 Statement ("Pl. 56.1 Statement") ¶ 2).

The addendum to the Contract stated that the Property is conveyed subject to "[a]ny state of facts which an accurate survey would show." (Gluckstern 6/9/03 Cert. Exh. B, Addendum ¶ 1(A)). After the parties executed the Contract, the Individual Defendants presented Plaintiff with a copy of the 1994 Survey. (Savo Aff. ¶ 4). That survey did not reveal the existence of underground oil tanks on the Property. (Id.) Plaintiff alleges that the Individual Defendants withheld two surveys, one from 1956 (the "1956 Survey") and the other from 1974 (the "1974 Survey"). Plaintiff claims these surveys reveal the existence of the two subsurface oil tanks on the Property which caused the Petroleum Discharge. However, with respect to the 1956 Survey, it was not discovered until 2002 by Mr. Linstra, whose family once owned the Property, when he was asked by Defendants' counsel to review documents in his possession relating to the Property. (Affidavit of John Linstra sworn to on August 8, 2003 ("Linstra 8/8/03 Aff.") ¶¶ 6–10). Further, neither the 1956 Survey nor the 1974 Survey reveal the existence of two underground oil tanks on the Property; rather they show the existence of two underground water tanks once used by the Jehovah's Witnesses when they owned the Property. (Russo. Aff. Exhs. H & I; Gluckstern 9/10/03 Cert. Exh. H; Linstra 8/8/03 Aff. ¶¶ 5, 8). In any event, the "acceptance of a deed by the purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of the seller to be performed pursuant to the provisions" of the Contract. (Gluckstern 6/9/03 Cert. Exh. B, Addendum ¶ 6).

On July 24, 1997, a heavy rainstorm resulted in four or more inches of rain falling in the New York City area. (Defs. 56.1 Statement ¶ 5). On July 24–25, 1997, a discharge of petroleum entered a body of water located at the South Shore Golf Club, which adjoins the Property. (Id. ¶ 8). South Shore employees reported the petroleum discharge to government authorities. (Id.) Because Plaintiff did not take immediate, appropriate action, the State of New York responded to and cleaned up the spill. (Id.)

Miller Environmental Group ("MEG"), a consultant to the NYSDEC, wrote a report, dated December 14, 1998, in which it determined that the source of the spill was two underground tanks on the Property containing petroleum. (Russo Aff. Exh. R). MEG reported that each of the tanks had an approximate capacity of 18,000 gallons, and that one of the tanks was full and the other was three-quarters empty. (Id.) The MEG Report concluded that the "heavy rains on [July 24] somehow caused

the oil release from the underground storage tanks. MEG did not remove the tanks, which was undertaken by the present property owner. Therefore, MEG does not know if tank #2 had a sudden release, as indicated by the liquid level in the tank." (*Id.*)

On or about November 19, 2001, the NYSDEC submitted to Plaintiff an invoice in the amount of $260,068.30 for the costs of the removal action. (Defs. 56.1 Statement ¶ 9). On October 2, 2002, Plaintiff, through one of its principals, Ottavio Savo, settled New York State's claim against it by agreeing to pay $250,000 to reimburse the State for the costs of cleanup and removal. (*Id.* ¶ 10). Plaintiff received a release from all liability due to the Petroleum Discharge from the State of New York in consideration for its voluntary payment of the Settlement Amount. (*Id.* ¶ 11). On May 17, 2002, Plaintiff, through its counsel, notified Defendants by letter about the Petroleum Discharge on the Property. (*Id.* ¶ 12; Gluckstern 6/9/03 Cert. Exh. K). In that letter, Plaintiff put Defendants on notice that it believed they were responsible for the Petroleum Discharge. (*Id.*) This lawsuit was subsequently filed on September 23, 2002.

## III. DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A genuine issue as to a material fact exists when there is sufficient evidence favoring the nonmoving party such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). Therefore, the non-moving party "may not rest upon the mere allegations or denials" of its pleadings; rather, its response must go beyond the pleadings to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when evaluating a motion for summary judgment, "[t]he courts must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. American Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### B. Evidentiary Challenges

Before turning to the substantive arguments raised by the parties with respect to their motions, the Court determines the admissibility of the affidavits of Ottavio Savo (the "Savo Affidavit") and John Cignatta (the "Cignatta Affidavit"), which Plaintiff proffers to oppose Defendants' summary judgment motion. Defendants argue that the Savo Affidavit, in whole or in part, constitutes inadmissible hearsay, and that the Cignatta Affidavit is unreliable, and therefore the Court should not consider them.

Under Fed.R.Civ.P. 56(e), an affidavit submitted in support of or in opposition to a motion for summary judgment "shall set forth such facts as would be admissible in evidence." It is therefore well-established that a "hearsay affidavit is a nullity on a motion for summary judgment." *Schwimmer v. Sony Corp. Of Am.*, 637 F.2d 41, 45 & n. 9 (2d Cir.1980); *see also Amnesty America v. Town of West Hartford*, 361 F.3d 113, 131 & n. 12 (2d Cir.2004) (district court deciding summary judgment motion was required to disre-

gard hearsay in affidavits because it would be inadmissible at trial). Against this background, the Savo Affidavit is addressed first.

### 1. Ottavio Savo Affidavit

■ Plaintiff proffers the affidavit of Ottavio Savo, President of Dora Homes, in an effort to raise a disputed genuine issue of material fact as to whether one or more of the Defendants had knowledge of the existence of underground oil tanks on the Property prior to entering into the Contract. In relevant part, Mr. Savo testified that at some unspecified time in 2002, he had conversations with Ventura, principal of Venstruct, who informed Mr. Savo that the Individual Defendants told him that he should leave the underground oil tanks on the Property while Ventura was performing the demolition work on the Property in 1990.[4] (Savo Aff. ¶ 9). Further, Mr. Savo testified that an unnamed "employee" of the Individual Defendants who resided on the property told Ventura that oil tanks existed underground on the Property and, subsequently, Ventura told Epperson of that fact.[5] (*Id.*) Mr. Savo also asserts that John Reebe, who was a subcontractor to Ventura for the demolition conducted at the Property, told Savo that he was instructed by Ventura to demolish the surface structures but leave the "subsurface tanks" in place.[6] (*Id.* ¶ 12).

■ In a footnote, Plaintiff's counsel argues that Mr. Savo's testimony relating to the purported statements made by Ventura and Reebe are admissible pursuant to Fed.R.Evid. 801(d)(2) (admission of party opponent) and Fed.R.Evid. 804(b)(3) (statement against party interest). Initially, the Court notes that although Plaintiff claims in its motion papers that the magistrate judge assigned to this case precluded it from deposing either Ventura or Reebe, this is simply untrue. In fact, at the hearing on the parties' respective motions, Plaintiff's counsel conceded that he had ample opportunity during discovery to depose Ventura (and Reebe) but elected not to.[7] (1/23/04 Tr. at 12–13, 20–21).

4. The Individuals Defendants strongly deny having had such conversations with Ventura, and state that these conversations could not have occurred when Savo said they did because at that time they were not even aware that two underground oil tanks existed on the Property. (Epperson 8/13/03 Aff. ¶¶ 5–8; Atsinger 8/14/03 Aff. ¶¶ 4–7).

5. Arnold Brown, an individual who was employed and lived on the Property during this time has submitted an affidavit in which he denied ever making the statement to Ventura which the Savo Affidavit appears to attribute to him. (Brown 7/31/03 Aff. ¶¶ 7–10).

6. The Savo Affidavit is introduced to contradict the testimony of the Individual Defendants, and third parties Arnold Brown and John Linstra, each of whom disclaimed knowledge of the existence of the underground oil tanks on the Property until 2002 when it was brought to their attention by Defendants' counsel.

7. Plaintiff argues that even if certain portions of the Savo Affidavit constitute inadmissible hearsay evidence, "Fed.R.Civ.P. 56(f) provides that, in actions such as this, where discovery has just begun, and plaintiff is unable to obtain in admissible form evidence needed to oppose a summary judgment motion, evidence offered to oppose summary judgment need not be in admissible form." (Pl. Mem. at 6 & n. 1). Not only is Plaintiff's premise supporting its argument wrong—discovery has not just "begun"—but Rule 56(f) does not say what Plaintiff's counsel says it does. Rule 56(f) states that "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order is just." If a party seeks to oppose summary judgment by arguing that it needs more discovery before the motion should be decided, that party bears the burden of submitting an affidavit or declaration detailing the following

Pursuant to Fed.R.Evid. 801(d)(2), a statement is not hearsay if it is offered against a party and is "(C) a statement by a person *authorized by the party* to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency, *made during the existence of the relationship.*"[8] (emphasis added). Neither of these exceptions to the hearsay rule is applicable to Ventura's and Reebe's alleged statements to Savo.

■■■ Plaintiff has presented no support for the proposition that Defendants authorized Ventura (or Reebe) to make a statement on their behalf concerning the existence of underground oil tanks under Fed.R.Evid. 801(d)(2)(C). "Courts have historically applied agency law to determine whether the declarant was authorized by the party to make the statement at issue." Weinstein's Federal Evidence, § 801.32[2] at 801–68 (2d ed.2004). Determining whether the purported statements by Ventura (or Reebe) qualify as an exception to the hearsay rule depends therefore on whether either or both individuals served as Defendants' "agent" or "independent contractor." *See generally Iwachiw v. New York State Department of Motor Vehicles*, 299 F.Supp.2d 117, 123 (E.D.N.Y.2004) (government entity, as a principal, would "not [be] liable for the wrongs of an independent contractor or

nonservant agent"). Generally, an independent contractor does not act as an agent of the hiring principal. *See, e.g., Teer v. Queens–Long Island Med. Group, Inc.*, 303 A.D.2d 488, 490, 755 N.Y.S.2d 430, 432 (2d Dep't 2003). Unlike an agent, whose acts are subject to the principal's direction and control, *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir.1984), an independent contractor is "one who, in exercising an independent employment, contracts to do certain work according to his own methods, and without being subject to the control of his employer, except as to the product or result of his work." *Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135, 142–43 (S.D.N.Y.1991) (citation and internal quotation marks omitted).

Here, no evidentiary proof in admissible form has been presented to demonstrate that Defendants intended Ventura to act as their agent for the demolition project. Rather, in their affidavits, both Epperson and Atsinger expressly state that Ventura's company "was an independent contractor hired to accomplish the purposes and goals set forth in the 1990 contract with Venstruct." (Epperson 8/13/03 Aff. ¶ 7; Atsinger 8/14/03 Aff. ¶ 6). Moreover, Plaintiff has not offered any evidence which would demonstrate that Defendants exercised any direction or control over Ventura or his firm (or Reebe, a subcon-

---

four elements: (1) the nature of the uncompleted discovery; (2) how the facts sought are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful. *See, e.g., Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994). Here, not only has Plaintiff not submitted a Rule 56(f) affidavit or declaration, it has failed to satisfy any of the elements required to obtain further discovery under Fed.R.Civ.P. 56(f). Therefore, the Savo Affidavit is not admissible evidence under Fed.R.Civ.P. 56(f).

8. Fed.R.Evid. 801(d)(2) also provides as follows: a statement is not hearsay if it is "offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) statement of which the party has manifested an adoption or belief in its truth ... or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." These provisions are inapplicable to the Savo Affidavit because there is no suggestion that Defendants made or adopted the statements attributable to Ventura or Reebe, or that Ventura or Reebe made the statements in furtherance of a conspiracy.

tractor) in connection with the demolition work he did on the Property, the touchstone of an agency relationship. *Murray Hill Films, Inc. v. Martinair Holland, N.V.*, 1987 WL 14918, at * 3 (S.D.N.Y. July 17, 1987) (quotation and citation omitted). Therefore, pursuant to Fed.R.Evid. 801(d)(2)(C), the Court finds that neither Ventura nor Reese were authorized to make the alleged statements on behalf of Defendants set forth in the Savo Affidavit.

■ The alleged statements by Ventura and Reebe reported in the Savo Affidavit also do not qualify for an exception to the hearsay rule under Fed.R.Evid. 801(d)(2)(D). Under that rule, a "sufficient foundation to support the introduction of vicarious admissions" requires, among other things, that the alleged statements were made during the course of the relationship. *Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 537 (2d Cir. 1992). Here, the alleged statements by Ventura and Reebe were not made during their relationship with the Defendants in 1990, but rather were purportedly made more than twelve years after Ventura and Reebe completed the demolition work on the Property. Therefore, for this reason alone, the statements do not qualify for an exception to the hearsay rule pursuant to Fed.R.Evid. 801(d)(2)(D).

■ Moreover, because, as noted above, Ventura (and Reebe) were independent contractors of Defendants, this is a separate and independent reason why Fed. R.Evid. 801(d)(2)(D) does not apply to their alleged statements to Savo. *See, e.g.,* Weinstein's Federal Evidence, 801.33[2][b] at 801–74 (2d ed.2004) ("statements of a party's independent contractors typically do not come within Rule 802(d)(2)(D)") (citations omitted).

■ Plaintiff also argues that Ventura's and Reebe's statements as recounted in the Savo Affidavit are not hearsay pursuant to Fed.R.Evid. 804(b)(3). That rules provides that a statement is not excluded by the hearsay rule where the declarant is unavailable and, "at the time of its making [it was] so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R.Evid. 804(b)(3). Here, Plaintiff has not shown that either Ventura or Reebe was "unavailable," for example, because at the time of the submission of this motion, either witness was dead, incapacitated or outside the subpoena power of the Court. To the contrary, Ventura spoke to both Plaintiff's and Defendants' counsel during discovery, and thus Ventura was clearly "available" to be deposed and within the subpoena power of the Court. (1/23/04 Tr. at 12); *see also Deutsche Asset Management, Inc. v. Callaghan,* 2004 WL 758303, at * 13 (S.D.N.Y. Apr.7, 2004) (statements are hearsay and do not qualify for the exception in Fed.R.Evid. 803(b)(4) and thus the court does not consider them on a summary judgment motion where party offering statements did not demonstrate that witnesses were unavailable).

In addition, Plaintiff has failed to show how the alleged statements made by Ventura and Reebe were against their interest. Indeed, the reason that Plaintiff seeks to introduce these statements in this case is to support its claim that Defendants (and neither Ventura nor Reebe) are liable in this case for the Settlement Money. Therefore, Plaintiff has failed to satisfy the elements necessary to gain the exception to the hearsay rule in Fed.R.Evid. 803(b)(4).

As such, the Court strikes the Savo Affidavit to the extent that it is predicated on the hearsay statements of Anthony Ventura and John Reebe.

## 2. John Cignatta Affidavit

 Plaintiff proffers the affidavit of its expert, John Cignatta ("Cignatta Affidavit"), to demonstrate, *inter alia*, the presence of a disputed issue of material fact as to when the underground oil tanks began leaking. Based on the limited evidence that he reviewed, and his "experience with military fueling and other facilities," Cignatta concluded that the Property was once a military site, that the tanks were "likely to have been installed in the 1940's," and that "it is almost certain that the mechanical integrity of these tanks would have been compromised by soil-side corrosion by the 1970's or 1980's" and "likely began discharging petroleum before 1997." (Cignatta Aff. ¶¶ 9, 20, 21). Cignatta also testified that Defendants were required to register, test, upgrade or permanently close the tanks pursuant to regulations that came into force between 1985 and 1989, when they still owned the Property. (Cignatta Aff. ¶ 23). Because Defendants failed to do so, Cignatta claims that this was a contributing factor to the Petroleum Discharge. (*Id.*)

 Defendants assert that the Court should not consider the Cignatta Affidavit because it is unreliable and therefore inadmissible. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." As explained by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), district courts are "gatekeepers" for expert testimony and must ensure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. Therefore, this Court must determine whether Cignatta's expert testimony "is relevant to the task at hand" and "rests on a reliable foundation." *See, e.g., In re Rezulin Prods. Liability Litigation*, 309 F.Supp.2d 531, 540 (S.D.N.Y.2004). Although Rule 702 sets forth specific criteria for the district court's consideration, these criteria are not exhaustive. The Court may consider a number of other factors in determining the reliability of the proffered testimony, including: (1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir.2004) (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786).

Cignatta is a licensed professional engineer who specializes in corrosion and environmental engineering. (Cignatta Aff. ¶ 2). Cignatta does not purport to have any experience with, or claim to be an expert regarding, the NYSDEC regulations that came into effect between 1985 and 1989, and also does not claim to be an expert on military facilities.[9] (*Id.*) The opinions contained in Cignatta's affidavit

---

9. There is no suggestion that Cignatta was ever qualified as an expert in any state or federal court.

are based on his evaluation of the following: (a) the MEG Report, which attaches photographs taken during the removal of the underground oil tanks in 1997; (b) affidavits of Arnold Brown and John Linstra; (c) the 1956 Survey and the 1974 Survey; and (d) analysis of a soil sample received from the Property by one of Plaintiff's employees nearly six years after the Petroleum Discharge. (*Id.* ¶¶ 2–3.)

After conducting a careful analysis of the Cignatta Affidavit, the Court concludes that it is unreliable under Fed.R.Evid. 702 and the principles articulated in *Daubert* and its progeny, and therefore the Court will not consider it in deciding the pending motions. Initially, the Court notes that instead of supporting his purported opinions through use of scientific principles, he qualifies his opinions throughout his affidavit with language which limits, and in some cases, negates his opinions. *See, e.g.,* Cignatta Aff. ¶ 5 ("it is apparent to me"); ¶ 9 ("it is almost certain ... that these tanks would have been compromised"); ¶ 21 ("the underground petroleum storage tanks ... were most likely on the property since the World War II era"). Equally troubling, Cignatta does not support his opinions with any methodology which the Court can analyze to determine whether his affidavit has the benchmarks of reliability which all expert testimony is required to satisfy.

Nothing in either *Daubert* or the Federal Rules of Evidence requires the Court to admit opinion evidence, such as Cignatta's, that is connected to existing data only by the *ipse dixit* of the expert. *Amorgianos v. National Railroad Passenger Corp.,* 303 F.3d 256, 266 (2d Cir.2002) (citations and internal quotations omitted). Therefore, the Court concludes, as discussed below in detail, that there is simply too great an analytical gap between the data and the opinions which Cignatta proffers for the affidavit to be deemed competent evidence.

Cignatta first testified that the Property "once housed a U.S. Army World War II" command, control and communications facility. (Cignatta Aff. ¶¶ 5–7). However, Cignatta did not cite to any specific research for his opinion, but rather relied only on his general experience with "military fueling and other facilities" and his review of the MEG Report, which does not discuss whether or not the Property once housed military buildings.[10] To the contrary, with respect to the use of the Property during or prior to the 1940's, the MEG Report states that the radio station that once stood on the Property "was under construction July 24, 1923 by the Peoples Pulpit Association for the purpose of broadcasting religious programs." (Russo Aff. Exh. R at 3). Further, Defendants' counsel's made a request for information relating to the Property to the Department of the Army. In response, the Department of the Army submitted a letter stating that the Property "was never owned or controlled by" the Department of Defense or any other "military component." [11] (Gluckstern 9/10/03 Cert. Exh.

---

**10.** The MEG Report notes that "[n]umerous radio components were" found on the Property, "some bearing 'U.S. Army' markings." (Russo Aff. Exh. R at 2). However, this fact does not reveal one way or the other whether the U.S. Army ever used the Property. The entities which operated radio stations on the Property for at least two generations may have, for example, purchased components for their facilities which were originally manufactured for or used by the U.S. Army.

**11.** In its brief, Plaintiff states that Defendants "admit that they knew that the U.S. Army used the property at some time prior to their ownership." (Pl. Mem. at 29, citing Russo Aff. Exh. E ¶ 3 (attaching answer)). However, Defendants do not admit anywhere in their answer or other papers that the U.S. Army used the Property at any time.

G). Therefore, Cignatta's "opinion" in this respect is predicated simply on his "experience," and nothing more, and is in opposition to the well-documented facts. *See, e.g., Mink Mart, Inc. v. Reliance Ins. Co.,* 65 F.Supp.2d 176, 180 (S.D.N.Y.1999) ("In order for an expert's opinion to be reliable and thus admissible, it must be grounded on verifiable propositions of fact") (citations omitted), *aff'd,* 2000 WL 33223395 (2d Cir. May 30, 2000).

Next, Cignatta testified that based on his review of photographs of the underground oil tanks appended to the MEG Report, and his analysis of a soil sample gathered from the Property at least six years after the spill, the tanks were "likely to have been installed in the 1940's, [and] it is almost certain that the mechanical integrity of these tanks would have been compromised by soil-side corrosion by the 1970's." (Cignatta Aff. ¶¶ 8–9). However, the Court observes that a reputable engineer would be hard pressed to offer an opinion about the structural integrity of two underground oil tanks solely by analyzing photographs taken of the tanks by a third party (MEG), and which were appended to a report that did not reach any conclusions about whether the oil tanks began leaking prior to 1997.[12] (Russo Aff. Exh. R, Appendix F (attaching photographs)). This is exactly what Cignatta does. *J.B. Hunt Transport, Inc. v. General Motors Corp.,* 243 F.3d 441, 444 (8th Cir.2001) (affirming district court's refusal to consider expert testimony under *Daubert* that "fails to qualify as scientifically valid" because it "was premised primarily upon [the expert's] impressions of the photographs of the scratches in the paint of the vehicles involved in the accident").

Further, Cignatta reaches these speculative conclusions even though he did not

inspect or independently evaluate the oil tanks that leaked in 1997. In fact, the MEG Report notes that Plaintiff removed the tanks after the Petroleum Discharge, *see* Russo Aff. Exh. R at 4, and thus to the extent that anyone could have conducted tests to determine the origin of the leaks in the tanks, it was the Plaintiff. Apparently, Plaintiff chose not to, and Cignatta certainly did not do so either.

In this respect, Cignatta does not indicate that he reviewed the testimony of Christopher Tomasello, who between February, 1988 and July, 2000, worked for the NYSDEC and was responsible for petroleum spill response from, among other places, Staten Island. (Tomasello Aff. ¶ 2). Mr. Tomasello was the NYSDEC case manager assigned to the Property and was primarily responsible for its cleanup. (Tomasello Aff. ¶ 4). Based on Mr. Tomasello's "observations and examination of the tanks and the soil surrounding them at the time of their actual excavation and removal from the property, [he] observed nothing which would indicate that a discharge of oil onto the South Shore Golf Course Property on or around July 25, 1997 was caused by tank failure prior to" that day. (Tomasello Aff. ¶ 10). Therefore, in reaching his conclusions, Mr. Tomasello relied on observations he made of the tanks immediately after the Petroleum Discharge. In contrast, Cignatta relied on at least six-year-old photographs of the tanks.

Further, Mr. Tomasello makes clear to the Court that the soil sample that Cignatta analyzed has no relevance to this case. Mr. Tomasello, who reviewed the Cignatta affidavit, states persuasively as follows: "Mr. Cignatta makes no reference to when the soil sample analyzed was taken. He does not establish by means of chains of

---

**12.** The MEG Report which Cignatta claims he considered, offers no opinion on the question whether the oil which leaked from the tanks had been leaking prior to July 24, 1997, or whether the Petroleum Discharge was a result of a sudden release. (Russo Aff. Exh. R at 4).

custody or his own personal knowledge that the soil sample is of the same soil which was present on the property in 1997, let alone that the sample he refers to is of soil which was present in the immediate vicinity of the tanks excavated in 1997. Only soil where the tanks actually were buried in and prior to 1997 would be of chemical or engineering relevance in the type of exercise Mr. Cignatta claims he is performing." (Tomasello Aff. ¶ 8).

Next, Cignatta declares that Defendants failed to register the two underground oil tanks pursuant to NYSDEC regulations that came into effect between 1985 and 1989. (Cignatta Aff. ¶¶ 10–15). Cignatta opines that the regulations required Defendants to survey the Property to determine if it contained any underground tanks, and if such tanks were found, to remove all liquids (presumably including oil) from the tanks. (*Id.* ¶ 13). However, Cignatta does not purport to be an expert qualified to give an opinion on the NYSDEC regulations. In addition, even if he was qualified to give such an opinion, he blindly assumes that these regulations applied to Defendants and required them to conduct an investigation to determine whether oil tanks existed on the Property. Cignatta does not provide the Court with a citation to the regulations to support this conclusion, and neither does Plaintiff's counsel. (Pl. Mem. at 26). In fact, the Court's review of the regulations did not uncover a requirement—as urged by Cignatta (and Plaintiff)—obligating every property owner in the State of New York to conduct a survey to determine whether underground oil tanks exist below the surface.

Finally, the Court observes that Cignatta did not explain what scientific "theories" he used in his affidavit, and thus it cannot determine whether his "theories" are generally accepted in the scientific community. Similarly, it is clear from the Cignatta Affidavit that his "theories" were the product of his own experience rather than scientific testing or peer review. Cignatta also did not state a known or potential error rate for his "theories."

Against this background, Cignatta's expert "opinions" are patently devoid of reliability. His opinions rest upon nothing more than subjective belief and unsupported speculation, and are based on data and a methodology which are simply inadequate to support the conclusions he reaches, or contrary to the documented facts. Thus, the Court finds that Cignatta's expert opinion testimony is inadmissible given the total lack of scientific rigor with which he reached his conclusions. *See generally Zaremba v. General Motors Corp.*, 360 F.3d 355, 358–60 (2d Cir.2004) (expert testimony that was speculative and unreliable properly not considered by the district court on summary judgment); *Rubinstein v. Marsh*, 1987 WL 30608 at *7 (E.D.N.Y.1987) ("[w]hen expert witnesses become partisans, objectivity is sacrificed to the need to win. Testimony which is prompted by that need and that goal may deprive an injured plaintiff of the compensation that may be justly due him or wreak havoc upon the reputation and financial condition of the defendant") (Glasser, J.).

## C. New York Navigation Law Claims

In opposing Defendants' summary judgment motion on Plaintiff's claims under the New York Navigation Law, Plaintiff relies on the following to demonstrate that Defendants had knowledge that the underground oil tanks were on the Property and that they were leaking when Defendants owned or controlled the Property: (a) the Cignatta Affidavit and Savo Affidavit, discussed above; (b) the 1956 Survey and 1976 Survey, as well as the closing statement from the Individual Defendants' purchase of the Property; (c) Defendants' fail-

ure to comply with NYSDEC regulations; and (d) Defendants' failure to obtain permits for the demolition of the Property in 1990. Based on this "evidence," Plaintiff claims that Defendants caused and contributed to the discharge of petroleum on July 25, 1997. As discussed below, Plaintiff has failed to create a genuine issue of material fact on its two claims under the New York Navigation Law, under § 181(5) and § 176(8), respectively.[13]

### 1. Claim Under Section 181(5) of the Navigation Law

■ Plaintiff's first cause of action in the Complaint seeks recovery against Defendants under § 181(5) of the Navigation Law. (Russo Aff. Exh. D, attaching Complaint ¶¶ 37–42). Article Twelve of the New York Navigation Law, commonly known as the Oil Spill Act, imposes strict liability upon "any person who has discharged petroleum ... without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained." N.Y. Nav. Law § 181(1).[14] The statute defines "discharge" as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow...." *Id.* at § 172(8). The term "waters" includes both surface and groundwater. *Id.* at § 172(18).

■ It is well-established under the Navigation Law that the State of New York was authorized to seek full reimbursement of the costs of the cleanup resulting from the Petroleum Discharge based on Plaintiff's ownership of the Property at the time of the oil spill. *White v. Regan,* 171 A.D.2d 197, 200–01, 575 N.Y.S.2d 375, 377 (3d Dep't 1991) (strict liability has been imposed on owners of real property on which a petroleum discharge occurs, even when the owner "unwittingly took title to property containing one or more undisclosed underground storage tanks"), *appeal denied,* 79 N.Y.2d 754, 589 N.E.2d 1263, 581 N.Y.S.2d 281 (1992).[15] A property owner who is held strictly liable for the costs of a petroleum discharge under the Navigation Law is authorized to bring a claim as an "injured person" for the cost of cleanup and removal against a prior owner, or any other

---

**13.** Plaintiff is correct in noting that because Defendants do not dispute any of the material facts set forth in its Rule 56.1 statement in support of its partial motion for summary judgment, these facts are deemed admitted. (Pl. Rep. Mem. at 3–4, citing *Gubitosi v. Kapica,* 154 F.3d 30, 31 (2d Cir.1998)). However, none of the facts that Plaintiff has set forth in its Rule 56.1 statement which are deemed admitted for purposes of the pending motions raise a genuine issue of material fact on Plaintiff's claims.

**14.** In its opening brief, Defendants argue that Plaintiff's Navigation Law claim is barred by a three-year statute of limitations. (Defs. Mem. at 12–13). However, in opposition, Plaintiff correctly argues that a six-year statute of limitations applies to actions, like the one filed by Plaintiff, for recovery of amounts paid to the State of New York resulting from

an oil discharge. *See, e.g., State of New York v. Stewart's Ice Cream Co.,* 64 N.Y.2d 83, 88–89, 473 N.E.2d 1184, 484 N.Y.S.2d 810 (1984); *145 Kisco Ave. Corp. v. Dufner Enterprises, Inc.,* 198 A.D.2d 482, 483, 604 N.Y.S.2d 963 (2d Dep't 1993). In reply, Defendants did not present further argument that Plaintiff's Navigation Law claim is time-barred. Accordingly, the Court finds that Plaintiff's Navigation Law claims, filed within six years of its payment of the Settlement Amount, are timely.

**15.** A property owner's strict liability as a "discharger" precludes it from seeking reimbursement from the State Environmental Protection and Spill Compensation Fund, which finances cleanup costs when a discharger is unknown, or is unwilling or unable to pay such costs. *See White, supra,* 171 A.D.2d at 200–01, 575 N.Y.S.2d at 377.

party, who actually caused or contributed to the discharge. *See* N.Y. Navigation Law § 181(5); *White v. Long*, 85 N.Y.2d 564, 568–69, 650 N.E.2d 836, 838, 626 N.Y.S.2d 989, 991 (1995) (subdivision (5) of the Navigation Law was "added by amendment in 1991 specifically to establish a private right of action under the statute") (hereinafter *"Long"*); *Mendler v. Federal Ins. Co.*, 159 Misc.2d 1099, 1105, 607 N.Y.S.2d 1000, 1004 (N.Y.1993) (plaintiff's "status as a discharger would not prevent him from seeking recovery under § 181(5) from other persons or entities which might fall within the definition of discharger").

However, a party pursuing an action under § 181(5) of the Navigation Law must be faultless, as Section 172(3) defines "claim" as "any claim by an injured person, *who is not responsible for the discharge*, seeking compensation for cleanup and removal costs incurred or damages sustained as a result of the petroleum discharge." (emphasis added). Therefore, once it is established that a property owner caused or contributed to a spill, the property owner will be precluded from seeking contribution from another discharger under § 181(5). *Hjerpe v. Globerman*, 280 A.D.2d 646, 647, 721 N.Y.S.2d 367 (2d Dep't 2001) (citing *e.g., Long* ).

It is undisputed that Plaintiff owned the Property at the time of the Petroleum Discharge, and subsequently entered into a settlement agreement with the State of New York, through the Attorney General's office, concerning Plaintiff's voluntary payment for the remediation of the Petroleum Discharge. As such, the Court finds that Plaintiff has not set forth any facts which would allow a reasonable juror to conclude that it lacked all culpability for the Petroleum Discharge. *See White*, 171 A.D.2d at 200–01, 575 N.Y.S.2d at 377 (property owner "most likely to be in position to halt the discharge, to effect an immediate cleanup,

or to prevent a discharge in the first place").

In fact, while Plaintiff attempts to point the finger at Defendants for the different omissions or actions they undertook or failed to undertake which should have alerted them to the existence of the underground oil tanks on the Property, courts analyzing Navigation Law claims in New York have held that a purchaser of Property, like Plaintiff in this case, "cannot rely on his or her limited knowledge of a discoverable condition—a situation that has been aptly termed 'conscious ignorance,' as a basis for recovery." *Vandervort v. Higginbotham*, 222 A.D.2d 831, 832, 634 N.Y.S.2d 800, 801 (3d Dep't 1995) (citing Restatement (Second) of Contracts § 154, comment c). Here, as noted above, the Contract which Plaintiff's principal signed, acknowledged that Plaintiff's acceptance of a deed ... shall be deemed to be a full performance and discharge of every agreement and obligation on the part of the seller to be performed pursuant to the provisions" of the Contract. (Gluckstern 6/9/03 Cert. Exh B, Addendum ¶ 6). The addendum to the Contract also states that the Property is conveyed subject to "[a]ny state of facts which an accurate survey would show." (*Id.* ¶ 1(A)). At no time prior to its purchase of the Property, did Plaintiff ask Defendants whether any surveys existed other than the 1994 survey which Defendants performed and provided to Plaintiff. Further, at no time did Plaintiff ever conduct a survey to determine whether the Property complied with all environmental laws and regulations as it alleges Defendants were required to do. As such, Plaintiff has failed to present evidence which would allow a reasonable jury to conclude that it was "faultless" with respect to the Petroleum Discharge.

Therefore, Plaintiff's claim under § 181(5) of the Navigation Law is dismissed.

## 2. Claim under Section 176(8) of the Navigation Law

■ A party, like Plaintiff, who is found to be a "discharger," may, however, seek contribution from others who bear culpability. Section 176(8) of the Navigation Law provides that "every person providing cleanup [or] removal of discharge of petroleum . . . shall be entitled to contribution from any other responsible party." Therefore, in order to prevail on its statutory claim for contribution, Plaintiff must establish that Defendants are "dischargers" under Section 172 and are a "responsible party." [16] The New York Court of Appeals has held that the statutory definition of "discharge" in § 172(8) does not require "proof of fault or knowledge" and therefore may extend to include landowners "who have both control over activities occurring on their property and reason to believe that their tenants will be using petroleum products." *State v. Green*, 96 N.Y.2d 403, 406–07, 754 N.E.2d 179, 182, 729 N.Y.S.2d 420, 423 (2001); *Lambrinos v. Exxon Mobil Corp.*, 2004 WL 2202760, at *7 (N.D.N.Y. Sept.29, 2004) (same); *Roosa v. Campbell*, 291 A.D.2d 901, 902, 737 N.Y.S.2d 461, 462 (4th Dep't 2002) (same); N.Y. Nav. Law § 172(8) ("discharge" means "any intentional or unintentional action or omission" resulting in an oil leak).

In this case, however, Plaintiff has failed to offer any evidence that Defendants reasonably knew about the underground oil tanks on the Property. Based on the New York Court of Appeals' holding in *Green*, in which it explicitly tied liability under § 172(8) and § 176(8) of the Navigation Law to a party's "knowledge" that property would contain petroleum products, Defendants are granted summary judgment

for this reason alone. *See also Hilltop Nyack Corp. v. TRMI Holdings, Inc.*, 272 A.D.2d 521, 523, 708 N.Y.S.2d 138, 140 (2d Dep't 2000) (affirming dismissal of certain claims where "the plaintiffs have failed to come forward with evidence of any intentional, reckless, or negligent act or omission on [defendant's] part that arguably caused or contributed to the contamination of their property").

Further, courts have dismissed claims under, *inter alia,* § 172(8) and § 176(8) of the Navigation Law where the evidence failed to establish that the petroleum discharge started during the time a property owner actually owned the property in question, because in that situation, the former property owner was not "responsible" for the leak. *See, e.g., Kozemko v. Griffith Co.*, 256 A.D.2d 1199, 1200, 682 N.Y.S.2d 503, 504 (4th Dep't 1998) (denial of motion to dismiss reversed where the "documentary evidence established that the underground tanks were not leaking prior to transfer of title to the gas station in 1991, and thus plaintiffs failed to state a cause of action under the Navigation Law"); *Fuchs & Bergh, Inc. v. Lance Enterprises, Inc.*, 2004 WL 2403564, at * 5 (N.Y.2004) (granting summary judgment on Navigation Law claim for indemnification where "defendants merely speculate, without providing any admissible evidence in support, that Tank No. 1 had a leak from the oil filter or a crack that could have exacerbated the spill and that said condition may have been known by defendants Hoffman and for which they may have been responsible"). That is the exact situation in this case as Plaintiff has failed to come forward with evidence that the Petroleum Discharge began prior to July 24, 1997.

---

**16.** Although Plaintiff does not specifically allege that its "contribution" claim is filed under the Navigation Law (Russo Aff. Exh. D, ¶¶ 59–62), the Court treats it as such. *See*

*generally McDermott v. City of New York*, 50 N.Y.2d 211, 216, 406 N.E.2d 460, 428 N.Y.S.2d 643 (1980) (the right to contribution is "dependent upon the legislative will").

Further, as discussed above, the Court cannot consider the Cignatta Affidavit as evidence that the oil leak on the Property began during the time when the Individual Defendants owned the Property. Moreover, Plaintiff states that Defendants had actual or constructive knowledge about the existence of the oil tanks on the Property due to the 1956 Survey, the 1976 Survey, the closing document relating to the Individual Defendants' purchase of the Property, the fact that permits were not obtained to perform the demolition work on the Property, and because Defendants were not in compliance with NYSDEC regulations. However, even accepting these allegations as true, they do not offer any factual support for the proposition that the oil leak began under Defendants' watch, when they owned or leased the Property. Indeed, as indicated above, Plaintiff has come forward with no admissible evidence indicating that the Petroleum Discharge occurred prior to July 24, 1997. To the contrary, Defendants have offered the testimony of Mr. Tomasello, the case manager working for NYSDEC who had responsibility for the remediation of the Property, who testified unequivocally that based on the "excavation around the source of the oil, the discovery of the underground tanks, and the excavation of those tanks and appurtenant soil," there is nothing to "indicate that a discharge of oil onto the South Shore Golf Course property on or around July 25, 1997 was caused by tank failure prior to July 25, 1997." (Tomasello Aff. ¶ 10).

Plaintiff's argument that had Defendants complied with NYSDEC regulations and "obtained the requisite demolition permit, the tanks would have been discovered and the discharge to the golf course that occurred in 1997 would have been avoided," *see* Pl. Mem. at 30—fails because it is not supported by any admissible evidence. Plaintiff argues, based solely on the Cignatta Affidavit, that had Defendants not conducted the demolition of the surface structures of the Property in 1990, "the vent hatches and pipes attached from the tanks to these buildings would have [been] made evidenct [sic] to [a] potential purchaser, like Dora that tanks were present. Had the demolition been performed properly, the tanks would have been discovered in the course of removing the foundations of the buildings and the concrete slab above the tanks. Under either scenario, the tanks would have been discovered, and the 1997 discharge could have been prevented." (Pl. Mem. at 34) (citing Cignatta Aff. ¶ 23). However, as discussed above, the Cignatta Affidavit is not admissible and therefore Plaintiff's argument lacks any support.

■ Moreover, Plaintiff's argument is also based purely on conjecture—that if Defendants had complied with applicable law, Plaintiff, during its inspection of the Property prior to closing, would have learned about the existence of the two underground oil tanks and they would have been removed. However, a party, such as Plaintiff, cannot validly support its opposition to a summary judgment motion with conjecture and surmise, which is what it does here. *See, e.g., Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 177 (2d Cir.2003) (affirming grant of summary judgment on Navigation law claims and noting that "because there is no evidence that points to one party rather than another, the only basis for such a jury finding would be impermissible speculation").

**D. Plaintiff's Common Law Indemnification Claim**

■ Defendants also argue that they are entitled to judgment as a matter of law on Plaintiff's common claim for indemnification. Plaintiff asserts that it is seeking reimbursement from Defendants on the

same basis that it seeks contribution under the Navigation Law, namely that it is a faultless landowner held strictly liable to the State for the costs of clean up of the Property, and Defendants are liable as "dischargers." Because Plaintiff's Navigation Law claim is dismissed, so too must the common law claim for indemnification.

■■■■■ A common law duty to indemnify is created by express or implied contract. *McDermott v. City of New York,* 50 N.Y.2d 211, 216, 406 N.E.2d 460, 428 N.Y.S.2d 643 (1980). A third party action for indemnity (or contribution) "does not lie against one who has not violated a duty owed to plaintiff in the primary action." *Garrett v. Holiday Inns, Inc.,* 86 A.D.2d 469, 470, 450 N.Y.S.2d 619, 620 (4th Dep't 1982), *aff'd,* 58 N.Y.2d 253, 460 N.Y.S.2d 774, 447 N.E.2d 717 (1983). Plaintiff has failed to show that Defendants owed it a duty with respect to the Petroleum Discharge. *See, e.g., Mitchell v. Suburban Propane Gas Corp.,* 182 A.D.2d 934, 936–37, 581 N.Y.S.2d 927, 930 (3d Dep't 1992) (no breach of duty to warn found where gas leaked out of underground tank where there was no "evidence in the record to show that defendant knew or should have known of the underground tank on plaintiffs' property and its dangerous condition"). In fact, Plaintiff expressly acknowledged in the Contract between the parties that Defendants had complied with all obligations they owed to Plaintiff in connection with the transfer of the Property to Plaintiff.

■■■ A claim for indemnity may also exist if the loss sustained by one party results in unjust enrichment to another party. *Garrett,* 86 A.D.2d at 470, 450 N.Y.S.2d at 620. The New York Court of Appeals has characterized the "classic indemnification case" as one in which:

> the one seeking indemnity had committed no wrong, but by virtue of some relationship with the tort-feasor or obligation imposed by law, was nevertheless held liable to the injured party. In other words, where one is held liable solely on account of the negligence of another, indemnification, not contribution, principles apply to shift the entire liability to the one who was negligent.

*Glaser v. M. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643, 646, 524 N.E.2d 413, 529 N.Y.S.2d 59 (1988) (citations omitted).

In order to prevail on its common law indemnification action against Defendants, Plaintiff must show that "it may not be held responsible in any degree" for the petroleum discharge. *Glaser,* 71 N.Y.2d at 647, 529 N.Y.S.2d 59, 524 N.E.2d 413. This standard is the same as that required in a contribution action under the Navigation Law.[17] *See* N.Y. Nav. Law §§ 181(5), 172(3).

Because Plaintiff has failed to present admissible evidence to support its assertion that Defendants are liable under the Navigation Law, no disputed issues of material fact exist, and Defendants are entitled to summary judgment as a matter of

---

17. Although Defendants argue that Plaintiff's common law claim for indemnification and contribution is barred by the New York General Obligations Law § 15–108 because Plaintiff made a voluntary payment to the State of New York in exchange for a release of liability, the Navigation Law provides otherwise. Navigation Law § 176(8) specifically authorizes indemnification or contribution claims notwithstanding N.Y. Gen. Oblig. § 15–108.

*See* N.Y. Navigation Law § 176(8) ("[n]otwithstanding any other provision of law to the contrary, including but not limited to section 15–108 of the general obligations law, every person providing cleanup, removal of discharge of petroleum or relocation of persons pursuant to this section shall be entitled to contribution form any other responsible party").

law on Plaintiff's common law claim for indemnification.

### E. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment on its Navigation Law claims, asserting that the undisputed material facts establish that Defendants' performance of an illegal demolition on the property in December 1990 constituted an "act or omission" that caused the Petroleum Discharge in July 1997, and that they are therefore liable to Plaintiff for the funds Plaintiff has paid to the State to reimburse the cost of the State's cleanup effort.

Plaintiff argues that even if the petroleum tanks did not begin leaking prior to the discharge that occurred in July 1997, that Defendants are liable because their 1990 demolition "set in motion" a chain of events that led to the discharge. Plaintiff asserts that if Defendants had conducted a lawful demolition, they would have excavated the foundations and necessarily would have discovered the petroleum tanks and been required to empty and remove them. Plaintiff also argues that had Defendants not performed the demolition at all, the tanks would have been discovered by Plaintiff during its inspection of the property through the visibility of vent hatches and pipes attached from the tanks to the above-ground structures that were demolished. Under either scenario, Plaintiff argues, the tanks would have been discovered and the 1997 discharge could have been prevented.

The cases relied upon by Plaintiff to support its motion, *Domermuth Petroleum Equip. and Maintenance Corp. v. Herzog & Hopkins*, 111 A.D.2d 957, 490 N.Y.S.2d 54 (3rd Dep't 1985) and *State v. Cronin*, 186 Misc.2d 809, 717 N.Y.S.2d 828 (N.Y. 2000), addressed the narrow question of liability of petroleum suppliers under the Navigation Law. *Domermuth* held that a supplier could be held liable when a fuel tank it had recently serviced ruptured and discharged fuel into the basement of a residence. The court there found that "[i]t is sufficient and uncontested that [the petroleum supplier], as the deliverer of the oil and the repairer of the tank, set in motion the events which resulted in the discharge." *Domermuth*, 111 A.D.2d at 959, 490 N.Y.S.2d 54 (citations omitted). In *Cronin*, the court refused to extend liability on the basis of a petroleum supplier's status alone, holding that "it would be unduly burdensome to extend liability for petroleum discharges to petroleum suppliers in the absence of some evidence that the supplier either caused or contributed to the discharge or that it possessed the ability to anticipate and/or prevent the discharge." *Cronin*, 186 Misc.2d at 812–13, 717 N.Y.S.2d 828. The petroleum discharge in *Cronin* was discovered more than two years after the supplier had ceased providing fuel and other services to the plaintiff. The court found that unlike the discharge in *Domermuth*, there was no evidence that the supplier "set in motion" the events which resulted in the discharge. *Id.* at 812, 717 N.Y.S.2d 828.

Read together, the holdings of *Domermuth* and *Cronin* indicate that evidence of a contemporaneous link between a party's actions and the petroleum discharge is relevant to finding liability. Although Plaintiff argues that Defendants "possessed the ability to anticipate and/or prevent the discharge," as contemplated by *Cronin*, the undisputed facts it offers in support of its motion do not allow a reasonable juror to come to such a conclusion. While it is undisputed that Defendants performed a demolition on the property in 1990 without obtaining the requisite permits and without removing the foundations, Plaintiff provides no legal authority, nor can any be ascertained, for holding

Defendants liable for the subsequent discharge from the petroleum tanks on this basis. Plaintiff's motion for summary judgment on its Navigation Law claims is therefore denied.

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted and Plaintiff's motion for partial summary judgment is denied. The Clerk of Court is accordingly directed to close this case.

SO ORDERED.